**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| ALBA DIAZ-GARCIA, *et al.*, <br><br> **Plaintiffs,** <br><br> **v.** <br><br> RAFAEL SURILLO-RUIZ, *et al.*, <br><br> **Defendants.** | **Civil No.** 13-1473 (FAB) |

**OPINION & ORDER**

BESOSA, District Judge.

Current and former employees of the Diagnosis and Treatment Health Center of Yabucoa ("CDT-Yabucoa") brought this suit, pursuant to 42 U.S.C. § 1983, against SM Medical Services, CSP ("SM Medical"), the president of SM Medical, Victor Simmons ("Simmons"), the director of SM Medical, Ricardo Rivera-Garcia ("Rivera") (collectively, the "SM Medical defendants"), the Municipality of Yabucoa (the "Municipality"), the mayor of Yabucoa, Rafael Surillo-Ruiz ("Mayor Surillo"), and the Municipality's liaison officer, Lydia Cruz ("Officer Cruz") (collectively, the "Municipal defendants"), alleging political discrimination in violation of the First and Fourteenth Amendments to the United States Constitution as well as the laws of Puerto Rico. (Docket Nos. 1, 44.)

Currently before the Court are defendants' motions for summary judgment, (Docket Nos. 131, 135), which plaintiffs opposed, (Docket No. 155). For the reasons discussed below, the Court **GRANTS in part and DENIES in part** the SM Medical defendants' motion for

summary judgment, (Docket No. 131), and **GRANTS in part and DENIES in part** the Municipal defendants' motion for summary judgment, (Docket No. 135).

### SUMMARY JUDGMENT STANDARD

A court will grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and [she] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it potentially affects the outcome of the case.  <u>Calero–Cerezo v. U.S. Dep't of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004).  A factual dispute is "genuine" if its resolution could favor either party at trial.  <u>Id.</u>

If the moving party shows the absence of a genuine issue as to any outcome-determinative fact, the nonmoving party must "demonstrate, through submissions of evidentiary quality, that a trialworthy issue persists" to forestall the entry of summary judgment.  <u>DePoutot v. Raffaelly</u>, 424 F.3d 112, 117 (1st Cir. 2005).  Conclusory allegations, improbable inferences, and rank speculation are insufficient to discharge the nonmovant's burden. <u>Id.</u>

At the summary judgment stage, a court must construe the entire record in a light most hospitable to the nonmoving party and draw all reasonable inferences in her favor.  <u>Id.</u>  What is more, the reviewing court refrains from making credibility

determinations, weighing the evidence, and drawing legitimate
inferences from the facts, because those tasks are properly left to
the jury.  See Hicks v. Johnson, 755 F.3d 738, 743 (1st Cir. 2014);
cf. Calero-Cerezo, 355 F.3d at 19 ("So long as the plaintiff's
evidence is both cognizable and sufficiently strong to support a
verdict in her favor, the factfinder must be allowed to determine
which version of the facts is most compelling.").

**BACKGROUND**

Viewing the evidence in a light most favorable to plaintiffs,
as the nonmoving party, and drawing all reasonable inferences in
their favor, the factual background is as follows:

**The CDT-Yabucoa**

Puerto Rico law creates government-owned health care centers -
"centros de diagnostico y tratamiento de salud" ("CDTs") - designed
to provide services to indigent persons.  See Docket No. 44 at pp.
23-24 & n.3.  The relevant statute directs Puerto Rico's Secretary
of Health to enter into agreements with municipalities to
effectuate the administration and operation of those health care
centers.  See id.  Pursuant to this statute, the Municipality of
Yabucoa[1] entered into an agreement with the Puerto Rico Department
of Health (the "PRDOH") by which the Municipality assumed
responsibility for the administration and control of its local CDT.

---

[1]  Yabucoa is a small municipality in Puerto Rico, with a population of
approximately 38,000.  (Docket No. 44 at ¶ 11.)

Id. at ¶ 21.  With this agreement, the Municipality became the nominating authority at the CDT-Yabucoa.  Id. at ¶ 22.  The CDT-Yabucoa's employees were considered municipal employees.  Id.

## The SM Medical Contract

On February 3, 2011, the Municipality entered into a five-year contract with SM Medical, a private corporation registered and organized under the laws of Puerto Rico, to assist with fulfilling its obligations to the PRDOH.  Docket No. 44 at ¶¶ 24-25; see also Docket No. 160-1 at p. 1.  Pursuant to the contract, SM Medical agreed to assume the responsibility of, at a minimum, the following services:

(A)  The full operation of the CDT that includes, among others: Laboratory; X-Rays; Pharmacy; specialist clinics such as Pediatrics, Cardiology, Gynecology and other agreed by the Municipality and SM Medical; and

(B)  Emergency Room – 24hrs/7days a week services.

(Docket No. 160-1 at p. 2.)  SM Medical further committed to "improv[ing] and maximiz[ing]" these services, "develop[ing] and implement[ing] new services [and] programs," and "maintain[ing] a quality of services in accordance to the public health standard for good practice."  Id.  SM Medical is required to "provide periodic reports to the Municipality of the functioning and operation of the [emergency room] facilities."  Id. at p. 3.

For its services, the Municipality agreed to pay SM Medical $95,833.33 per month for the first seventeen months of the

contract's five-year term, and $83,333.33[2] per month thereafter. (Docket No. 160-1 at p. 7.)  The contract also provided for profit-sharing with respect to certain earnings from SM Medical's operation of the facilities.  See Docket No. 44 at ¶ 27.

Upon execution of the contract, SM Medical assumed the CDT-Yabucoa's personnel, employees,[3] and professional service contracts.  (Docket No. 160-1 at p. 5.)  Employees hired to work at the CDT-Yabucoa after the contract's execution would not be considered "municipal employees" unless: (1) the Municipality recruited them directly; and (2) the municipal budget covered their salary.  Id.  For its general hiring, SM Medical agreed to consult with the Municipality regarding the selection of personnel.  Id. at p. 9.  The contract calls for the creation of a municipal officer position, a "municipal liaison," to be appointed by the mayor.  (Docket No. 160-1 at p. 5.)  As the title suggests, the municipal liaison is "the liaison between the [M]unicipality and SM Medical," as well as "the advisor who governs on administrative matters in [the contract]."  Id.  The municipal liaison is specifically responsible for evaluating SM Medical's requests and making corresponding recommendations to the mayor.  Id.  The municipal liaison is to be considered a municipal officer.  Id.

---

[2]  This amount was later amended so that the Municipality continued to pay $95,833.33 per month.  (Docket No. 160-1 at p. 12.)

[3]  Pursuant to the contract, SM Medical specifically agreed to assume certain municipal employees listed in "attachment B" to the contract. (Docket No. 160-1 at p. 5.)  Neither party submits this attachment.

According to the contract, SM Medical's relationship to the Municipality is that of an "independent contractor," and "[n]othing contained in th[e] agreement will constitute or be interpreted as [creating] a partnership, joint venture, or lease" between the Municipality and SM Medical.  (Docket No. 160-1 at p. 7.)

The contract was signed by Angel "Papo" Garcia-de Jesus ("Garcia"), the mayor of Yabucoa at the time, on behalf of the Municipality, and Simmons, SM Medical's president, on behalf of SM Medical.  See Docket No. 160-1 at p. 10.  After making the arrangement with SM Medical, Garcia frequently visited the CDT-Yabucoa and remained actively involved in its affairs.  See, e.g., Docket No. 156-6 at pp. 42-43; Docket No. 156-1 at pp. 10-13.

Approximately two years into the contract, the Municipality became delinquent on its payments to SM Medical.  See Docket No. 44 at ¶ 33.  By the end of 2012, uncertainty arose as to whether SM Medical would maintain its contractual relationship with the Municipality.  See id. at ¶¶ 2, 33, 55-56.

### The 2012 Yabucoa Mayoral Election

On November 6, 2012, after a highly contentious race, Mayor Surillo, the Popular Democratic Party ("PDP") candidate, defeated Garcia, the New Progressive Party ("NPP") candidate and incumbent, to become the mayor of Yabucoa.  (Docket No. 44 at ¶¶ 10, 38.) Mayor Surillo took office on January 14, 2013.  Id. at ¶ 10.

After the election, rumors began to circulate at the CDT-Yabucoa regarding the impact of the regime change.  See Docket No. 156-3 at pp. 36-53.  A politically-charged environment developed, and within it, employees affiliated with the former mayor's campaign felt an air of uncertainty.  See id.

Against this backdrop emerge the events giving rise to the political discrimination claims at issue.

### The Plaintiffs

Plaintiffs are four current and former CDT-Yabucoa employees who allegedly suffered adverse employment actions because of their political leanings:  (1) Alba Diaz-Garcia ("Diaz"); (2) Nezmaida Medina-Sanchez ("Medina"); (3) Carlos Lazu-Santiago ("Lazu"); and (4) Juana Velazquez-Torres ("Velazquez").  The nature of each plaintiff's employment and political affiliation is discussed below.

### *Plaintiff Diaz*

Diaz worked as the administrative secretary at the CDT-Yabucoa from May 11, 2011, until she was terminated on January 31, 2013. (Docket No. 156-3 at pp. 13, 24-32.)  During her tenure, Diaz provided administrative support for the municipal liaison, the corporate representative, the director of nursing, and the 911 supervisor.  Id. at p. 31.  Diaz's duties also included greeting visitors, assisting with payroll, answering phones, and other tasks assigned to her by Rivera or Simmons.  Id. at pp. 31-32.

Diaz is a member of the NPP and is active in Yabucoa politics. (Docket No. 156-3 at pp. 52-53.)  She often worked at polling centers and attended meetings, caravans, walkabouts, and other political events.  Id.  Diaz is the niece of former mayor Garcia, who was involved in Yabucoa politics for twelve or more years.  Id. In light of her uncle's political career, Diaz has known Mayor Surillo for some time.  Id. at p. 65.  Mayor Surillo is from the same neighborhood and voting ward as Diaz, and he saw her during the election working at their local polling station.  Id. at p. 66. When Diaz volunteered at the polling station, she donned a blue shirt indicating NPP support.  Id.  After the election, former mayor Garcia gave Mayor Surillo a tour of the CDT-Yabucoa facilities and introduced Diaz as his niece.  Id.

### Plaintiff Medina

Medina began working at the CDT-Yabucoa as the director of nursing of the emergency room in March 2011.  (Docket No. 156-1 at p. 10.)  In this role, Medina supervised the nursing department, managed the work schedules and annual vacation leave plans for the nursing staff, prepared reports for the emergency department, supervised the vaccination area, and purchased medical and surgical supplies.  Id. at pp. 18-19.  Although Medina was an exemplary employee with no complaints about her performance, id. at p. 78, she was demoted on February 22, 2013, id. at p. 68.  Medina now works as the CDT-Yabucoa's "purchasing officer."  Id. at pp. 17-19.

Medina is an NPP member and was an active supporter of Garcia's mayoral candidacy. (Docket No. 155 at p. 7.)  Mayor Surillo has known Medina's family since childhood and, at the time of the events in question, played softball with Medina's father. (Docket No. 156-1 at pp. 70-72.)  According to Medina, Mayor Surillo knows Medina's family as members of the NPP and is aware that her brother was the NPP-affiliated president of Yabucoa's municipal assembly for twelve years.  Id.

### Plaintiff Lazu

Lazu began working at the CDT-Yabucoa as a nursing supervisor on February 3, 2011. (Docket No. 156-4 at p. 18.)  In this role, Lazu's duties included overseeing the nursing staff to ensure compliance with prevailing standards of care, coordinating nurse staffing, generating work programs, and occasionally providing nursing services.  Id. at p. 31.  On February 26, 2013, Lazu was transferred to the CDT-Canovanas, another SM Medical-run facility, and was demoted to the position of associate nurse.  Id. at pp. 31-41.  Lazu worked at the CDT-Canovanas until he resigned on November 15, 2013.  Id. at pp. 31-32, 78-79.

Lazu is an active member of the NPP and was a longtime supporter of former mayor Garcia. (Docket No. 156-4 at pp. 108-120.)  Lazu was publicly involved in Garcia's mayoral campaign, having attended and worked at numerous political functions.  Id. As a spokesperson for Garcia, Lazu routinely appeared on local

radio stations to promote Garcia's candidacy and to criticize Mayor
Surillo.   (Docket No. 155-1 at ¶ 202.)   Lazu has known Mayor
Surillo since childhood and believes that Mayor Surillo is aware of
his longstanding friendship with former mayor Garcia.  (Docket No.
156-4 at pp. 128-30.)   Lazu also believes that Mayor Surillo is
aware of his political affiliation because on several occasions
during the election season, Mayor Surillo saw Lazu advocating on
his opponent's behalf.  Id. at pp. 132-36.

### Plaintiff Velazquez

Velazquez worked at the CDT-Yabucoa from February 16, 2011,
until she officially resigned on September 3, 2012.  (Docket No.
156-2 at pp. 23, 58.)   Velazquez was originally hired as an
administrative officer, but her title later changed to "corporate
representative."  Id. at pp. 27-31.  In her position, Velazquez did
a variety of administrative tasks, such as preparing office letters
and memoranda, maintaining files, organizing records, and assisting
with payment disbursements.  Id. at pp. 44-57.  Velazquez helped
with hiring at the CDT-Yabucoa by writing job descriptions,
collecting applications, and organizing interviews.  Id.  She also
supervised clerical, maintenance, custodial, and security
employees.  Id.  After June 2012, Velazquez also began working as
a security officer for the CDT-Yabucoa.  Id. at pp. 52-53.

Velazquez is an active member of the NPP, having held a trust
position in Garcia's administration from 2008-2009, (Docket No. 155

at p. 8), and having served as a poll station worker during Garcia's 2012 mayoral campaign, (Docket No. 156-2 at p. 127-128). Velazquez submits that her activism is well known to PDP members because her neighbor is the president of Yabucoa's local PDP chapter and during his meetings, she would not allow PDP-affiliated individuals to park in front of her home and "would openly and proudly display flags and propaganda alluding [to] the NPP and [to Garcia]." (Docket No. 155-1 at ¶ 140.) Velazquez believes that Officer Cruz is aware of her political affiliation because she participated in caravans and walkabouts for the NPP, which would frequently cross paths with PDP caravans and walkabouts. Id. at pp. 139-42. During this time, Velazquez believes Officer Cruz saw her advocating for the NPP candidate. Id.

### Post-Election Discrimination

After the election, in early December 2012,[4] Mayor Surillo and his team visited the CDT-Yabucoa to meet with Simmons to discuss the Municipality's contract with SM Medical. (Docket No. 156-2 at pp. 58-59.) During this meeting, Simmons asked Velazquez for a list of CDT-Yabucoa employees. Id. at p. 60. Velazquez complied, giving Simmons a list containing each employee's name, department,

---

[4] The parties dispute when the meeting occurred. Plaintiffs maintain that the meeting took place in December 2012, see Docket No. 155-1 at ¶ 33, while the SM Medical defendants claim that Mayor Surillo did not come to the CDT-Yabucoa until after assuming office in mid-January 2013, see Docket No. 133 at ¶ 14. Mayor Surillo testified that he did not recall the date of the meeting or whether it took place before or after he took office. See Docket No. 156-6 at pp. 38, 45.

position, and start date.  Id. at pp. 60-62.  According to Simmons,
when Mayor Surillo received the list, he skimmed it, read certain
names out loud, and made statements such as: "[plaintiff] Carlos
Lazu, oh, he was one of [Mayor] Surillo's 'tirapiedras,'[5] he's
out"; and "[plaintiff] Nezmaida Medina, who's that? Oh, the
redheaded sister [of the former NPP-affiliated leader]. [She's]
out."  (Docket No. 156-1 at pp. 67-69.)

    When the meeting ended, Velazquez asked Simmons what was going
to happen.  (Docket No. 156-2 at p. 63.)  Simmons responded, "they
want some employees, you saw they wanted the list."  Id.  Velazquez
took that to mean that Mayor Surillo and his aides wanted hospital
positions that they could fill.  (Docket No. 155-1 at ¶ 99.)
Simmons then indicated that there were going to be "changes" at the
CDT-Yabucoa.  (Docket No. 156-2 at p. 65.)

    Indeed, following the 2012 mayoral election, Simmons and
Rivera made several similarly foreboding comments to plaintiffs,
causing them - as Garcia supporters - to feel insecure about their
jobs.  For example, in or around December 2012, Simmons instructed
Diaz to "update [her] resume," warned her that her continued
employment depended on what the new mayor wanted, and told her that
in light of the change in leadership, "anything could happen."

---

[5] The record indicates that "tirapiedras" is Spanish for "stone
thrower," see, e.g., Docket No. 156-1 at pp. 67-68, but a better
translation in this context is "political agitator," see Docket No. 109
at p. 8 n.6.

(Docket No. 156-3 at pp. 32-24.)   Around that time, Rivera told
Diaz that because she was the ex-mayor's niece, the new mayor might
be inclined to remove her.   Id. at p. 50.

On several occasions, Rivera explained to Medina that she "had
to understand" that Garcia had lost the election and that "there
were going to be changes" in light of Yabucoa's new leadership.
(Docket No. 156-1 at pp. 64, 75-76.)[6]   Rivera also informed Medina
that Mayor Surillo told him that people who campaigned on his
behalf were asking for positions, id. at p. 95, and that Mayor
Surillo indicated that he wanted "people of his trust" in
administrative roles, id. at p. 75.   In the same vein, at some
point after the election, Rivera notified Lazu that the new
administration was "going to be putting [its] people in." (Docket
No. 156-4 at p. 103.)

After the December 2012 meeting, the forewarned-of "changes"
at the CDT-Yabucoa began to manifest themselves.   A basic
chronology of these events is sketched below.

**_Plaintiff Diaz's Termination_**

On January 31, 2013, Rivera informed Diaz that, with Simmons's
authorization and at the new mayor's request, she was being fired.
(Docket No. 156-3 at pp. 13, 117-18.)   At the time of Diaz's

---

[6]   Simmons made similar comments to Lazu, indicating that due to the new
administration, "there were going to be some changes" at the CDT-Yabucoa.
(Docket No. 156-4 at pp. 87-91.)   Having campaigned against Mayor
Surillo, Lazu understood these statements to be directed at him.   Id.

termination, Rivera indicated that the reason for the decision was the change in municipal leadership and said that he and Simmons were otherwise happy with her performance.  Id. at pp. 117-18.

### SM Medical's Interim Hiring

On January 22, 2013, approximately one week before Diaz's termination, Rivera told Velazquez that Mayor Surillo would be sending people to the CDT-Yabucoa for jobs.  (Docket No. 156-2 at pp. 66-67.)  After firing Diaz, SM Medical went on to hire three of these individuals:  Gabriela Riefkohl ("Riefkohl"); Tina Rodriguez ("Rodriguez"); and Mariliz Ortiz ("Ortiz").  See Docket No. 155 at p. 13.  SM Medical also created a Human Resources ("HR") department at the CDT-Yabucoa and hired Migdalia Delgado ("Delgado" or "HR Director Delgado") as its director.  Shortly thereafter, Mayor Surillo appointed Officer Cruz as the CDT-Yabucoa's municipal liaison.  A timeline of these events is as follows:

On January 31, 2013, the day of Diaz's termination, Rivera told Velazquez: "[A]n employee is coming tomorrow, her name is Gabriela Riefkhol . . . . [S]he's going to do the same duties as [Diaz], but please introduce her as [HR] coordinator, because you cannot say the same thing as [Diaz's position]." (Docket No. 156-2 at p. 67.)  During this conversation, Velazquez voiced concern regarding her job stability.  Id. at p. 77.  Rivera responded: "Well, you know, there are going to be some changes.  [Garcia] is no longer [in office], and . . . [Mayor Surillo] doesn't want you,

Lazu, [Medina], [or] [Diaz], who already got [fired]." Id.[7]

The next day, on February 1, 2013, Delgado began working as the CDT-Yabucoa's new HR director. See Docket No. 135 at pp. 23-25; Docket No. 131 at pp. 24-25.

On the same day, as foretold by Rivera, Riefkhol began working as Diaz's *de facto* replacement. (Docket No. 156-2 at p. 67.) Riefkohl sat at Diaz's old desk, and Velazquez supervised Riefkohl as she had previously supervised Diaz. Id. at pp. 69-73. Riefkohl initially performed the same secretarial functions as Diaz. Id. at pp. 73-77. Only later was Riefkhol tasked with assisting Delgado in the HR department. See Docket No. 156-9 at pp. 53-54.

Once Riefkohl had assumed her HR responsibilities, SM Medical brought in a new replacement for Diaz, hiring Rodriguez to serve as the municipal liaison's administrative assistant on February 15, 2013. (Docket No. 156-2 at pp. 77-79.)

On the same day, Ortiz began working at the CDT-Yabucoa in a nursing capacity. (Docket No. 156-1 at pp. 76-77.) Ortiz told Medina that she "had been placed there by [Mayor Surillo]." Id. at p. 97. While her employment application indicated that she sought the position of director of nursing, id. at pp. 73-74), Ortiz came to occupy the position of "nursing supervisor," (Docket No. 156-9 at pp. 12-17). When she was hired, and for the first five months

---

[7]  On a separate occasion, Simmons made similar remarks to Velazquez to the effect that Mayor Surillo did not want her or other Garcia supporters working at the CDT-Yabucoa. (Docket No. 156-2 at pp. 83-88.)

of her employment, Ortiz did not have a nursing license. (Docket No. 156-6 at p. 132.) Medina was tasked with training Ortiz and, during this time, discovered that Ortiz fulfilled essentially all of her duties as director of nursing, aside from the purchasing-related tasks. (Docket No. 156-1 at pp. 30-34.)

On February 19, 2013, Officer Cruz began working as the CDT-Yabucoa's municipal liaison. (Docket No. 156-8 at p. 56.) Officer Cruz was appointed by Mayor Surillo; she is a fellow PDP member and supported his campaign. (Docket No. 155 at pp. 13-14.)

### *Plaintiff Medina's Demotion*

During this period of reshuffling, Medina's concern for her job security increased, so she reached out to her father, a longtime acquaintance of Mayor Surillo, who agreed to speak to the mayor on her behalf. (Docket No. 156-1 at pp. 64-65.) On February 21, 2013, Mayor Surillo came to the CDT-Yabucoa to assure Medina that she would not be fired. Id. at p. 65. Later, Rivera called Medina to tell her that Mayor Surillo had instructed him not to dismiss her and indicated that he must obey "since [the mayor] is the boss." Id. at p. 66. Rivera went on to say, however, that Mayor Surillo wanted to fill administrative positions with his own people, explaining "that's why we had to get rid of [Diaz], because [she] is not a person of trust with the mayor." Id.

The next day, HR Director Delgado informed Medina that she would be removed as the director of nursing. (Docket No. 156-1 at

p. 68.)  In lieu of firing Medina, Delgado offered a reassignment.
Delgado initially suggested the role of "epidemiologist nurse," a
position that did not previously exist, but Medina declined, as she
had no experience in that area.  Id.  Delgado then suggested the
position of "purchasing officer."  Id. at pp. 17-19.  Medina signed
a letter indicating that she accepted "freely and voluntarily" the
reassignment because Delgado gave her an ultimatum: take the
position or "lose [your] job."  Id. at pp. 58-59.  Later that day,
Simmons came to Medina's office to discuss her reassignment,
appearing "red as a tomato" and nervous.  (Docket No. 156-1 at
pp. 67-69.)  Simmons told Medina, "if you feel pressure, I feel
even more."  Id.  He then told her about Mayor Surillo's
politically-charged comments at the December 2012 meeting.  Id.

Medina's new position turned out to be a curtailed version of
her former position and a demotion:  her salary was reduced by $300
per month, she lost her status as an exempt employee, her duties
were diminished to merely ordering medications and surgical
equipment, and she was removed from her office and assigned to work
in the supply closet, which was isolated and unclean.  See Docket
No. 156-1 at pp. 18-24, 40-44.

**Plaintiff Lazu's Transfer and Demotion**

On February 26, 2013, Lazu was transferred to the CDT-
Canovanas.  (Docket No. 156-4 at pp. 31-41.)  As a resident of
Yabucoa, the new placement required Lazu to commute an hour each

way.  Id. at pp. 72-79, 149-151.  Additionally, Lazu was demoted from supervising nurse to associate nurse, which meant a change in his duties as well as a salary reduction of $500 per month.  Id. at pp. 31-41.  Although Lazu signed a document indicating that he "freely and voluntarily" accepted his transfer, he did so because Delgado told him he could either change facilities or be jobless. See id. at 41-42.

Lazu worked at the CDT-Canovanas until he resigned on November 15, 2013, as he was unable to cope with the higher transportation costs and lower salary.  (Docket No. 156-4 at pp. 31-32, 78-79.) Before resigning, Lazu made efforts to speak with Simmons and Rivera about his demotion and salary reduction.  Id. at pp. 31-32. On one occasion, Lazu asked Rivera in person whether he might consider returning Lazu to the CDT-Yabucoa.  Id. at p. 32.  Rivera told Lazu that he should "speak to the mayor" if he wanted to be transferred back.  Id.

### *Plaintiff Velazquez's Hostile Work Environment*

Before the 2012 mayor election and resulting change in administration, Velazquez never had problems at the CDT-Yabucoa. (Docket No. 156-2 at pp. 129-30.)  After Officer Cruz joined the staff, however, Velazquez began to experience issues at work.  For example, on April 23, 2013, while Velazquez was in a meeting with HR Director Delgado, Officer Cruz came in to scream at her about a decision that Velazquez made regarding the hospital's security.

Id. at pp. 100-03.  In May 2013, after Velazquez ordered food for an event on Officer Cruz's request, Officer Cruz complained to Simmons that Velazquez failed to follow instructions.  Id. at pp. 103-04.  On or about June 17, 2013, Officer Cruz gave Velazquez "the finger" in the hospital hallway.  Id. at p. 104.

These negative interactions culminated when, in late June or early July 2013, Officer Cruz started a fight with Velazquez and screamed in her face until another employee intervened.  (Docket No. 156-2 at pp. 106-07.)  Among other things, Officer Cruz stated loudly: "Do you understand that the administration [has] changed?" Id. at p. 107.  When Velazquez responded that she understood, Officer Cruz said, "I'm fed up. I'm going to call [Mayor Surillo] so that he calls [Simmons] because this has to [stop] already." Id.  HR Director Delgado suspended Velazquez for the incident.  Id. at 108.  After her suspension, Velazquez felt she had no other option but to resign.  Id. at pp. 132-33.  On September 3, 2013, Velazquez officially ceased working for SM Medical.  Id. at p. 58.

### LEGAL PRINCIPLES
### 42 U.S.C. § 1983

Plaintiffs sue defendants pursuant to 42 U.S.C. § 1983. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

> injured in an action at law, suit in equity, or other
> proper proceeding for redress.

42 U.S.C. § 1983.  Simply put, section 1983 "renders persons acting

under color of state law liable for constitutional and federal-law

violations."  Elena v. Municipality of San Juan, 677 F.3d 1, 6 (1st

Cir. 2012).  To make out a viable section 1983 claim, a plaintiff

must show that: (1) a person deprived her of a federally secured

right; and (2) the perpetrator acted under color of state[8] law.

Santiago v. Puerto Rico, 655 F.3d 61, 68 (1st Cir. 2011).

## Political Discrimination[9]

The political discrimination framework finds its roots in the

---

[8]  For purposes of section 1983, Puerto Rico is the functional equivalent
of a state.  Santiago v. Puerto Rico, 655 F.3d 61, 69 (1st Cir. 2011).

[9]  In their opposition, plaintiffs attempt to clarify that their First
Amendment claims are not limited to discrimination, but include
retaliation.  (Docket No. 155 at p. 46.)  Plaintiffs are correct that the
two causes of action, though similar, are distinct.  See, e.g., Rosaura
Bldg. Corp. v. Municipality of Mayaguez, 778 F.3d 55, 66 (1st Cir. 2015).
In a political discrimination case, "'government officials are forbidden
from taking adverse action against [a] public employee[] on the basis of
[her] political affiliation or belief.'"  Id. (quoting Mercado-Berrios v.
Cancel-Alegria, 611 F.3d 18, 22 (1st Cir. 2010)).  Whereas in retaliation
cases, the public employee's speech, rather than her political
affiliation, is at issue.  Id.

In this case, the record is abundantly clear that plaintiffs' claims
are limited to discrimination.  To establish a free-speech retaliation
claim, a plaintiff must show: (1) "that [s]he spoke as a citizen on a
matter of public concern"; (2) "that [her] interest in speaking
outweighed the government's interest, as [her] employer, in promoting the
efficiency of the public services it provides"; and (3) "that [her]
speech was a substantial or motivating factor" in her firing, transfer,
or demotion.  See Rodriguez v. Municipality of San Juan, 659 F.3d 168,
180 (1st Cir. 2011).  To make a claim of speech-based reprisal,
plaintiffs would have to establish that they spoke out, which they have
not done.  The Court thus construes plaintiffs' claims as limited to
political discrimination.

First Amendment's free-speech protections.  Cordero-Suarez v. Rodriquez, 689 F.3d 77, 81 (1st Cir. 2012).  Among other things, the First Amendment protects associational rights. Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004).  "Incorporated within this prophylaxis is the right to be free from discrimination on account of one's political opinions or beliefs." Id.  This right extends to matters of public employment:  as a general rule, public employees enjoy protection from adverse employment actions based on their political affiliations. Carrasquillo v. Puerto Rico ex rel. Justice Dep't, 494 F.3d 1, 4 (1st Cir. 2007).

A two-part burden shifting framework is used to evaluate claims of political discrimination.  See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).  First, the plaintiff must, at a minimum, show that she engaged in constitutionally-protected conduct and that this conduct was a substantial factor in the adverse employment decision. Carrasquillo, 494 F.3d at 4.  If the plaintiff does her part, the burden shifts to the defendants to point out evidence that they would have taken the same action regardless of the plaintiff's political affiliation - "a defense familiarly known as the Mt. Healthy defense." Rodriguez v. Municipality of San Juan, 659 F.3d 168, 176-77 (1st Cir. 2011).

### DISCUSSION

Both sets of defendants move for summary judgment.  The SM Medical defendants argue that summary judgment is warranted for two reasons: (1) plaintiffs do not satisfy section 1983's "under color of state law" requirement; and (2) plaintiffs do not establish a *prima facie* case of political discrimination.  (Docket No. 131.) The Municipal defendants likewise argue that plaintiffs fail to establish a *prima facie* case of political discrimination, while also asserting a qualified immunity defense.  (Docket No. 135.)

The Court will first address the state action issue as to the SM Medical defendants.  The Court will then determine whether plaintiffs establish a *prima facie* case of political discrimination, addressing defendants' overlapping and distinct arguments in the process.  Finally, the Court will assess the Municipal defendants' qualified immunity defense.

Before delving into the analysis, however, the Court must clarify the scope of plaintiffs' claims.  Plaintiffs Diaz, Medina, and Lazu do not appear to bring claims against Officer Cruz.  With respect to Diaz, the record is clear that she never worked with Officer Cruz: Diaz was terminated on January 31, 2013, (Docket No. 156-3 at p. 32), and Officer Cruz began working at the CDT-Yabucoa on February 19, 2013, (Docket No. 156-8 at p. 56). Similarly, with respect to Lazu, the record shows that he was transferred from the CDT-Yabucoa to the CDT-Canovanas on February

26, 2013, see Docket No. 156-4 at pp. 31-41, approximately one week after Officer Cruz began working at the CDT-Yabucoa. Nothing in the complaint - or even in the record at large - indicates that Lazu and Officer Cruz interacted in any capacity, professional or otherwise during this time, let alone that Officer Cruz discriminated against Lazu. Indeed, in their opposition, plaintiffs make no effort to establish Lazu's *prima facie* case of discrimination against Officer Cruz.

The record is arguably less clear as to whether Medina intends to bring claims against Officer Cruz. On one hand, plaintiffs' opposition includes instances of Medina's exclusion from SM Medical events at Officer Cruz's behest as well as claims that Officer Cruz verbally belittled Medina. See, e.g., Docket No. 155-1 at ¶¶ 73, 78. On the other, these grievances are not included in the complaint. Moreover, plaintiffs never try to establish that Officer Cruz knew of Medina's political affiliation, which is required for a *prima facie* case of political discrimination.

For the foregoing reasons, the Municipal defendants' motion for summary judgment, (Docket No. 135), is **GRANTED** as to plaintiffs Diaz, Medina, and Lazu's claims against defendant Officer Cruz. To the extent that plaintiffs Diaz, Medina, and Lazu bring claims against defendant Officer Cruz, these claims are **DISMISSED**.

### State Action[10]

Seeking summary judgment, the SM Medical defendants first argue that plaintiffs' political discrimination claim against SM Medical, Rivera, and Simmons is doomed for want of state action, an essential requirement for section 1983 liability.  See Docket No. 131 at pp. 10-17.  According to the SM Medical defendants, they are "private [parties] whose alleged actions did not transpire under color of state law."  Id. at p. 2.  The SM Medical defendants concede that, in limited circumstances, the conduct of private parties may constitute "state action" for purposes of section 1983, but argue that "this is not one of them."  Id. at 11.

To make out a viable section 1983 claim, a plaintiff must show that the rights-depriving conduct transpired under color of state law.  Santiago, 655 F.3d at 68.  Section 1983 excludes from its reach "merely private conduct, no matter how discriminatory or wrongful."  Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50

---

[10] Regarding the term "state action," the Court provides two points of clarification.  First, technically speaking, "state action" is Fourteenth Amendment parlance.  Nevertheless, courts have long treated section 1983's under-color-of-state-law requirement as functionally equivalent to the Fourteenth Amendment's state-action requirement.  See, e.g., Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de P.R., 84 F.3d 487, 491 (1st Cir. 1996).  To that end, the Court "regard[s] case law dealing with either of these formulations as authoritative with respect to the other" and "use[s] the terminologies interchangeably."  See Santiago, 655 F.3d at 68.

Second, "'state action'" includes action not only by states, but also by their political subdivisions (e.g., cities and towns)."  Perkins v. Londonderry Basketball Club, 196 F.3d 13, 18 n.3 (1st Cir. 1999).  The Court thus discusses the Municipal defendants' involvement in terms of "state action."

(1999) (internal quotation marks omitted).  This is not to say, however, that ostensibly private organizations and individuals are impervious to section 1983 suit.  To the contrary, "private actors may align themselves so closely with either state action or state actors that the undertow pulls them inexorably into [section 1983's] grasp."  Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 253-54 (1st Cir. 1996).  In such cases, "conduct by nominally private actors can be characterized as governmental action for constitutional purposes."  Gonzalez-Maldonado v. MMM Healthcare, Inc., 693 F.3d 244, 247 (1st Cir. 2012).

Where a plaintiff sues non-government actors pursuant to section 1983, she must show that the private defendants' conduct is "'fairly attributable to the State,'" so as to "constitute action under color of state law."  Santiago, 655 F.3d at 68 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).  Within this analytical arena, the First Circuit Court of Appeals has identified three avenues through which a private individual or entity may be deemed a state actor: the public function test; the state compulsion test; and the nexus/joint action test.  Santiago, 655 F.3d at 68-69.  If the record, viewed through a lens favorable to plaintiffs, makes out a jury question as to any one of these tests, the "under color of state law" requirement is satisfied for summary judgment purposes.  Id. at 69.

In an effort to shield their section 1983 claims from summary

judgment attack on the state action element, plaintiffs contend
that the evidence demonstrates: (1) that the defendants acted
jointly to deprive plaintiffs of their First Amendment rights; and
(2) that Mayor Surillo and Officer Cruz compelled the rights-
depriving conduct.  <u>See</u> Docket No. 155 at pp. 32-38.  The Court
will evaluate plaintiffs' evidence first pursuant to the state
compulsion test.

     At the motion to dismiss stage, this Court found that
plaintiffs adequately plead facts to meet the state compulsion
test. (Docket No. 109 at pp. 17-18.)  The standard for deciding a
Rule 12(b)(6) motion to dismiss, however, differs considerably from
the standard for deciding a Rule 56 motion for summary judgment:
the former requires the court to take all well-pleaded allegations
of fact as true, while the latter requires only that the court
indulge in favor of the nonmoving party all reasonable inferences
arising from facts established by affidavit, deposition, or other
reliable method.  <u>See</u> <u>Garcia-Catalan v. United States</u>, 734 F.3d
100, 104 (1st Cir. 2013) ("[S]ummary judgment, like a trial, hinges
on the presence or absence of evidence, not on the adequacy of the
pleadings.").  At this stage, plaintiffs contend that "[t]he
evidence on the record . . . supports each of the averments on
which the Court's [previous] ruling relied." (Docket No. 155 at
p. 35.)  Defendants beg to differ.  <u>See</u> Docket No. 131 at pp. 13-
15; Docket No. 135 at pp. 52-54.

"[A] private party is fairly characterized as a state actor when the state 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of the State.'" Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 5 (1st Cir. 2005) (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)). "[T]o establish state action under [the state compulsion test], a plaintiff must demonstrate a particularly close tie between the state and the private party's conduct, such that the conduct may fairly be regarded as state action." Santiago, 655 F.3d at 71. As the First Circuit Court of Appeals informs, "[the] inquiry is a targeted one, with the challenged conduct at the hub of the analytical wheel." Id. (internal quotation marks omitted); see also Perkins v. Londonderry Basketball Club, 196 F.3d 13, 19-20 (1st Cir. 1999) ("[T]he focal point [of the state compulsion test] is the connection between the State and the challenged conduct, not the broader relationship between the State and the private entity.").

According to plaintiffs, the evidence that the Municipal defendants encouraged the personnel decisions at issue begins after Mayor Surillo's 2012 electoral victory. Velazquez testified that Mayor Surillo and his staff met with Simmons in early December 2012, and that during this meeting Simmons asked Velazquez to retrieve a list of CDT-Yabucoa employees, per Mayor Surillo's

request.  (Docket No. 156-2 at pp. 58-62.)  Although none of the plaintiffs were in attendance, Medina testified that Simmons later told her that during this meeting, Mayor Surillo went through the list and identified those employees to be removed because of their ties to the former administration, openly stating: "[plaintiff] Carlos Lazu, oh, he was one of [Mayor] Surillo's 'tirapiedras,' he's out"; and "[plaintiff] Nezmaida Medina, who's that? Oh, the redheaded sister [of the former NPP-affiliated leader]. [She's] out."  (Docket No. 156-1 at pp. 67-68.)[11]

Plaintiffs contend that after the December 2012 meeting, the events giving rise to their complaint occurred: Diaz was terminated, Medina was demoted, Lazu was transferred and demoted, and Velazquez was effectively driven out by harassment.  According to plaintiffs, all of whom are supported Mayor Surillo's opponent, the timing of these events is no coincidence.  Plaintiffs' theory is that after he was elected mayor of Yabucoa, Mayor Surillo wanted to give CDT-Yabucoa jobs to his political backers as a reward for

---

[11] Defendants make an issue of plaintiffs' lack of personal knowledge as to certain statements, including those Mayor Surillo allegedly made in the December 2012 meeting.  See, e.g., Docket No. 131 at pp. 17-18; Docket No. 135 at p. 31.  "Personal knowledge" is the touchstone for the admissibility of *affidavits* opposing summary judgment.  See Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").  Here, however, the parties rely upon *deposition testimony*, not affidavits.

their loyalty and support.[12]  To effectuate this plan, Mayor Surillo
compelled or encouraged Simmons and Rivera to get rid of a handful
of employees who had campaigned against him in order to make room
for his allies.   Amplifying Mayor Surillo's pressure on the SM
Medical defendants, plaintiffs posit, was the risk of losing the
CDT-Yabucoa contract.   Faced with the mayor's encouragement and
fearing the loss of an important contract, Simmons and Rivera caved
to the new administration's demands.

        To survive summary judgment, plaintiffs are tasked with
putting forth proof of municipal coercion or significant
encouragement as to the employment actions at issue.  See Santiago,
655 F.3d at 71.  Because the state compulsion test is laser-focused
on "the connection between the State and the challenged conduct,"
see Perkins, 196 F.3d at 19-20, the Court will inspect each of the
plaintiff's grievances for evidence of municipal string pulling.

        With respect to Diaz, the alleged rights-depriving conduct is
her termination on the basis of her political affiliation.  Simmons
and Rivera admittedly partook in the decision to fire Diaz.
(Docket No. 133 at ¶ 128.)  The question is thus whether the record
supports a finding that the Municipality coerced or significantly
encouraged this decision.  The Court finds that it does.  Diaz
testified that after the December 2012 meeting, Simmons told her to

_____

[12] There are situations in which political loyalty is an appropriate
requirement of employment.  See, e.g., Ruiz-Casillas v. Camacho-Morales,
415 F.3d 127, 133 (1st Cir. 2005).  This is indisputably not one of them.

"update [her] resume because [her] permanence depended on [Mayor Surillo's] decision." (Docket No. 156-3 at p. 33.) Diaz was fired soon thereafter, and she testified that Rivera indicated to her that the "new mayor" was the reason. Id. at 13.

     As defendants point out, these remarks could be construed in a less incendiary way—for example, perhaps the defendants were simply conveying the possibility that the new mayor might see fit to cancel his predecessor's contract with SM Medical. See Docket No. 133 at ¶¶ 112-115. Still, plaintiffs proffer evidence from employees who remained at the CDT-Yabucoa after Diaz's departure indicating that Mayor Surillo compelled the discriminatory termination. Medina's testimony that Rivera told her that "[SM Medical] had to get rid of [Diaz]" because Mayor Surillo wanted administrative vacancies and that "[Diaz] is not a person of [the mayor's] trust," is evidence of municipal compulsion or encouragement, (Docket No. 156-1 at p. 66), as is Velazquez's testimony that Rivera specifically told her that SM Medical fired Diaz at Mayor Surillo's request, (Docket No. 156-2 at p. 77). Although Rivera might deny making these statements,[13] the Court cannot choose between the competing testimonies at the summary judgment stage. See, e.g., Santiago-Ramos v. Centennial P.R.

_____

[13] The SM Medical defendants, for instance, contend that the various statements Simmons and Rivera allegedly made regarding Mayor Surillo's orders to terminate, demote, and transfer plaintiffs are "figments of [their] imaginations," and point out that Simmons and Rivera denied making such statements and that Mayor Surillo denied giving such orders. (Docket No. 131 at p. 14.)

Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000) ("For purposes of summary judgment, we cannot weigh the credibility of witnesses making these comments and must assume they were made as stated.").

With respect to Medina and Lazu, plaintiffs submit ample evidence to support a finding of municipal coercion or encouragement. Most notably, as discussed above, Medina testified that at the time of her demotion, a nervous Simmons came to her office, expressed feeling "pressure[d]," and told her about Mayor Surillo's politically-driven demand for her and Lazu's removal at the December 2012 meeting. (Docket No. 156-1 at pp. 67-68.) The record contains other evidence of the mayor's influence, such as Velazquez's testimony that in early February 2013, just weeks before Medina's demotion and Lazu's transfer, Rivera told her that Mayor Surillo did not want her, Lazu, or Medina at the CDT-Yabucoa. (Docket No. 156-2 at p. 77.) Velazquez also testified that Rivera told her that Mayor Surillo did not want Lazu at the CDT-Yabucoa because of his radio show activism. See id. at p. 80. Viewed in a light most favorable to plaintiffs, this evidence is plainly demonstrative of municipal compulsion or encouragement.

Regarding Medina's demotion, defendants maintain that Simmons and Rivera were not involved in the decision. See Docket No. 133 at ¶ 177. To be sure, the record indicates that as of February 2013, the CDT-Yabucoa had HR officials to carry out personnel decisions, see Docket No. 156-9 at p. 54, and plaintiffs admit that

it was HR Director Delgado who formally executed Medina's reassignment, see Docket No. 155 at pp. 19, 22-23.

While plaintiffs might lack direct evidence to show that Simmons and Rivera were involved in Medina's demotion, plaintiffs present sufficient circumstantial proof that they were. Chief among this evidence is Medina's testimony regarding her conversations with Mayor Surillo and Rivera. Medina testified that at some point after the 2012 mayoral election, fearing for her job's security, she asked her father to speak with his friend and softball teammate, Mayor Surillo. (Docket No. 156-1 at p. 70-71.) On February 21, 2013, Mayor Surillo came to the CDT-Yabucoa to tell Medina she would not be *fired*, and later that day, Rivera called Medina to tell her that he would obey Mayor Surillo's instruction to not *dismiss* her. See id. at pp. 67-69. The following day, Medina found out that she would, in fact, keep her job, so long as she accepted a demotion. See id. This sequence of events illustrates not only the fact of Rivera's participation in the decision to demote Medina, but the degree of Mayor Surillo's influence over the matter. Plaintiffs also provide circumstantial evidence of Simmon's involvement, including Medina's testimony about Simmons's behavior and admissions on the day of her demotion. See id.

With respect to Velazquez, however, plaintiffs fail to satisfy the state compulsion test. In Velazquez's case, the rights-

depriving conduct is the hostile work environment that Officer
Cruz, a municipal employee, is said to have cultivated.  Plaintiffs
allege a series of events - including false accusations, threats of
reprimand, and verbal abuse - which culminated in Velazquez's
suspension and constructive discharge.   Regarding the events
leading up to the suspension, however plaintiffs provide no
evidence that either Simmons or Rivera performed the challenged
actions, let alone that they did so at the behest of a state actor.

     Velazquez's suspension is the only event in which any SM
Medical defendant is alleged to have partaken.  Plaintiffs maintain
that HR Director Delgado told Velazquez that she was suspending her
pursuant to Simmons's instruction.  <u>See</u> Docket No. 155 at p. 28.
But plaintiffs provide no competent evidence of municipal
compulsion.  Plaintiffs rely upon Velazquez's testimony that, at
the time of her suspension, Delgado said that "Mayor Surillo had
called [Simmons]."  <u>See</u> Docket No. 156-2 at pp. 107-109.  This
evidence is insufficient.  To begin, Delgado is not a party to this
action, and thus her statement about the mayor's call is
inadmissible hearsay.  <u>See</u> <u>Soto-Padro v. Pub. Bldgs. Auth.</u>, 675
F.3d 1, 7 (1st Cir. 2012) (finding testimony that "smacks of
hearsay" cannot defeat summary judgment, particularly where
plaintiff points to no applicable hearsay-rule exception).  More to
the point, the record sheds no light on what Mayor Surillo said to
Simmons before Simmons allegedly instructed Delgado to suspend

Velazquez.    Plaintiffs'   unsupported   speculation   is   plainly
insufficient  to  discharge  their  summary  judgment  burden.    <u>See</u>
<u>DePoutot</u>, 424 F.3d at 117.

     To  the  extent  plaintiffs  may  be  relying  on  Velazquez's
testimony  as  to  the  various  statements  Rivera  and  Simmons
purportedly made regarding Mayor Surillo's desire to terminate her
and other Garcia supporters as proof of municipal coercion, <u>see,</u>
<u>e.g.,</u> Docket No. 156-2 at pp. 83-88, this evidence is unavailing.
In the context of the state compulsion inquiry, the focal point is
"the connection between the State and the challenged conduct."
<u>Perkins</u>, 196 F.3d at 19-20.  The mayor's alleged encouragement of
Velazquez's  dismissal  took  place  in  the  weeks  following  his
election  victory,  from  December  2012  through  February  2013.
Velazquez was not suspended until July 2013.  These events are too
temporally attenuated to constitute a "close nexus" between the
Municipality and the challenged conduct.

     In  sum,  plaintiffs  fail  to  provide  sufficient  proof  of
municipal compulsion to hold the SM Medical defendants liable as
state actors for the particular actions taken against Velazquez.
Most of the complained-of conduct against Velazquez is attributable
specifically to Officer Cruz, who is a municipal actor and who did
not begin working at the CDT-Yabucoa until months after the post-
election municipal compulsion took place.  To the extent plaintiffs
claim that Simmons had a hand in Velazquez's suspension, they

provide no competent proof that any municipal actor coerced or encouraged him to do so.  For these reasons, the Court finds that plaintiffs do not satisfy the state compulsion test for the actions taken against Velazquez.

Plaintiffs advance an alternative avenue for finding state action: that the SM Medical defendants "acted jointly" with the Municipal defendants to deprive plaintiffs of their First Amendment rights.  See Docket No. 155 at p. 35.  Plaintiffs contend that the record demonstrates that defendants "jointly planned, orchestrated[,] and executed" the challenged actions.  Id. at p. 34.

As an initial point of clarification, it is evident that plaintiffs are not pursuing a "nexus/joint action" theory of liability for the SM Medical defendants.  The nexus/joint action test provides that "a private party can be held to be a state actor where an examination of the totality of the circumstances reveals that the state has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity]."  Estades-Negroni, 412 F.3d at 5 (internal quotation marks omitted).  To pass this test, a plaintiff must show that "the private party's actions are attributable to the state through a symbiotic relationship between the two."  Santiago, 655 F.3d at 71.  The opposition, however, tenders no proof of symbiosis between the Municipality and SM

Medical in its discussion of the state action element.  Moreover, plaintiffs rely on cases such as <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970), and <u>Alexis v. McDonald's Restaurants of Mass., Inc.</u>, 67 F.3d 341 (1st Cir. 1995), (Docket No. 155 at p. 33), which do not fit within the First Circuit Court of Appeals' nexus/joint action rubric.

But plaintiffs' evidence need not square with the three conventional models to establish state action.  Regarding the state-action determination, the United States Supreme Court has consistently embraced a fact-specific approach.  <u>See, e.g.</u>, <u>Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n</u>, 531 U.S. 288, 298 (2001); <u>Lugar</u>, 457 U.S. at 939.

It is possible that a private individual who is a "willful participant in joint activity with the State or its agents" can be held liable under section 1983.  <u>See Dennis v. Sparks</u>, 449 U.S. 24, 27 (1980).  To establish joint discriminatory action between private and state actors, plaintiffs must put forth evidence of a "plan, prearrangement, conspiracy, custom, or policy." <u>Alexis</u>, 67 F.3d at 351.  The evidence must be sufficient to "enable a rational factfinder to conclude that [the rights-depriving conduct] resulted from concerted action tantamount to substituting the judgment of a private party for that of the [state actor] or allowing the private party to exercise state power." <u>Id.</u> at 351-52.

Read in a light most favorable to plaintiffs, the record contains at least some evidence demonstrating a plan between Mayor Surillo, Simmons, and Rivera to discriminate against Velazquez on the basis of her political affiliation.  For example, Velazquez testified as to various statements Rivera and Simmons made to her regarding Mayor Surillo's desire to terminate her and other employees who supported his opponent.  See, e.g., Docket No. 156-2 at pp. 83-88.  The record, however, contains no evidence as to Officer Cruz's knowledge of this alleged conspiracy or plan.  Again, Officer Cruz was hired months after the post-election conduct.  See Docket No. 156-8 at p. 56.  Perhaps the only indication of Officer Cruz's possible involvement in a discriminatory plan is plaintiffs' evidence that Officer Cruz, in chastising Velazquez, asked whether Velazquez understood that "the administration [had] changed," and threatened to "call the mayor." See Docket No. 156-2 at pp. 106-107.  Without context or further elaboration, these comments hardly establish that Officer Cruz was a co-conspirator in a discriminatory scheme, especially considering that, as discussed infra, plaintiffs fail to show Officer Cruz was even aware of Velazquez's political leanings.

In any event, the mere existence of a discriminatory plan is insufficient to hold the SM Medical defendants liable as state actors.  The color-of-law element requires that "defendant acted 'under color of law.'"  Adickes, 398 U.S. at 150 (emphasis added);

cf. Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 273
(2d Cir. 1999) ("Section 1983 does not impose civil liability on
persons who merely stand to benefit from an assertion of authority
under color of law, but only on those who act under color of
law."). For example, in Adickes v. S.H. Kress & Co., the Supreme
Court found a private restaurant employee to be acting under color
of state law for "reaching an understanding" with a state police
officer and for conspiring with the officer to deprive a customer
of her civil rights. 398 U.S. at 150-60. In that case, the
defendant-employee had *acted*: he refused the plaintiff-customer
service on the basis of her race. See id. at 147.

In this case, plaintiffs must not only show that the SM
Medical defendants had an agreement or plan with the Municipal
defendants to drive out Velazquez through harassment and
suspension, but that the SM Medical defendants acted in concert
with the Municipal defendants to execute this plan. As discussed
supra, the complained-of harassment is largely limited to Officer
Cruz's actions: it was Cruz who chastised Velazquez for the air
conditioners; yelled at Velazquez about the security; reprimanded
Velazquez for the food order; gave Velazquez the finger; and
berated Velazquez in the ER. The record contains no evidence that
the SM Medical defendants acted to effectuate Officer Cruz's
conduct. To the contrary, the record indicates that to the extent
Officer Cruz, a municipal actor, deprived Velazquez of her

constitutional rights, she acted alone in doing so.  See Roche, 81 F.3d at 254 (finding no principled basis for attributing state action to a private insurance company who reported the criminal conduct of a former employee where the police officers, magistrate, and prosecutors involved in pursuing the case all exercised independent judgment and acted of their own volition); Collins v. Womancare, 878 F.2d 1145, 1154 (9th Cir. 1989) (finding no state action where state official used independent judgment, rather than the judgment of a private party, in issuing citations to protesters).

At best, the evidence indicates that Velazquez made Simmons and Rivera aware of Officer Cruz's maltreatment and that neither intervened on her behalf.  See, e.g., Docket No. 156-2 at pp. 109-31.[14]  Such passive acquiescence is hardly enough to hold Simmons and Rivera liable as state actors.  Cf. Yaretsky, 457 U.S. at 1004-05 (finding "mere approval" of the initiatives of a private party insufficient to render the private party a state actor for section 1983 purposes).  The Court is thus unable to find that the SM Medical defendants acted jointly with the Municipal defendants to deprive Velazquez of her First Amendment rights.

For the foregoing reasons, insofar as the SM Medical defendants move for summary judgment for want of state action,

---

[14]  Velazquez allegedly reported these incidents, but the evidence does not reveal that, in doing so, she described Officer Cruz's harassment as politically driven.  See, e.g., Docket Nos. 144-1, 144-2, 144-3.

(Docket No. 131), the motion is **GRANTED** as to plaintiff Velazquez, but **DENIED** as to the remaining plaintiffs.  Plaintiff Velazquez's claims against the SM Medical defendants are **DISMISSED**.

### *Prima Facie* Case

A political-discrimination plaintiff must first show that she engaged in constitutionally-protected conduct and that this conduct was a substantial factor in the adverse employment action taken against her.  Carrasquillo, 494 F.3d at 4.  The First Circuit Court of Appeals has found that a *prima facie* political-discrimination claim typically entails "four showings": (1) that the plaintiff and the defendant belong to opposing political affiliations; (2) that the defendant has knowledge of the plaintiff's opposing political affiliation; (3) that an adverse employment action occurred; and (4) that political affiliation was a substantial or motivating factor behind the adverse action.  See Peguero-Moronta v. Santiago, 464 F.3d 29, 48 (1st Cir. 2006).

Both sets of defendants maintain that plaintiffs fail to establish a *prima facie* case of political discrimination, albeit for different reasons.  While the SM Medical defendants argue that plaintiffs fail to satisfy the opposing-affiliation element, the Municipal defendants contend that plaintiffs fail to establish the knowledge element.  Neither set of defendants dispute that plaintiffs satisfy the adverse-action element.  Finally, both sets of defendants argue that plaintiffs do not satisfy the causation

element.   The Court will address plaintiffs' proof as to each element.

### *Opposing Political Affiliations*

Regarding the first element, opposing political affiliations, it is undisputed that plaintiffs are members of the NPP and that defendants Mayor Surillo and Officer Cruz are members of the PDP, an opposing political party.   With respect to the SM Medical defendants, however, the record reveals that, like plaintiffs, Simmons and Rivera are also NPP members.   The SM Medical defendants thus challenge whether the opposing-affiliation requirement is met with respect to Simmons and Rivera.   See Docket No. 131 at p. 7. In opposition, plaintiffs argue that the absence of opposing party affiliations is not dispositive.   (Docket No. 155 at p. 39 n.10.) The Court agrees.

The First Circuit Court of Appeals has held that the fact that the defendant is a member of the same political party as the plaintiff does not necessarily alter the "constitutionally protected status" of the plaintiff's political affiliation. Padilla-Garcia v. Guillermo Rodriguez, 212 F.3d 69, 76 & n.6 (1st Cir. 2000); cf. Anthony v. Sundlun, 952 F.2d 603, 606 (1st Cir. 1991) ("[L]iability in a political discrimination case involving non-policymaking positions [does not] necessarily depend[] on a finding that the defendants knew to a certainty that the ousted jobholders were members of the opposition party.").

To determine whether the opposing political affiliation requirement of the *prima facie* case is met in cases of intra-party discrimination, courts opt for a more nuanced approach. For example, the First Circuit Court of Appeals has found that a claim for impermissible political discrimination may lie where a plaintiff and her employer support different factions of the same political party during a primary election. <u>See, e.g.,</u> <u>Padilla-Garcia</u>, 212 F.3d at 76. In doing so, the court of appeals reasoned that "the underlying principle, freedom to express political beliefs, is very much still at stake" where members of a single political party adhere to different philosophies or subscribe to different factions. <u>Id.</u>

While this case does not involve an intra-party conflict in the context of a primary election, the First Circuit Court of Appeals's reasoning applies with equal force. Here, plaintiffs attribute the alleged discriminatory acts to their support of a specific leader within their political party during a particular election. The record demonstrates that plaintiffs were not merely NPP members, they were avid supporters of former mayor Garcia during the 2012 mayoral race in Yabucoa. While Simmons and Rivera might also have been members of the NPP party, neither lived in Yabucoa, <u>see</u> Docket No. 156-7 at p. 62; Docket No. 133-5 at p. 49, nor indicated an allegiance to Garcia's mayoral candidacy. In this regard, their political affiliations are beside the point. What

matters is that plaintiffs were allegedly targets of discrimination on the basis of their political beliefs and associations.  This is sufficient to satisfy the first prong.

### Knowledge of Political Affiliation

Plaintiffs must also establish that defendants were aware of their political affiliation.  See Garcia-Gonzalez v. Puig-Morales, 761 F.3d 81, 98 (1st Cir. 2014).  Only the Municipal defendants challenge plaintiffs' proof as to this element.  (Docket No. 135 at pp. 57-60.)  The Court will determine whether the knowledge element is met as to each plaintiff.

### Plaintiff Diaz

Plaintiffs put forth several pieces of evidence in support of their contention that Mayor Surillo was aware of Diaz's ties to the NPP.  The record reveals that Diaz is the niece of Garcia, Yabucoa's former NPP-affiliated mayor, and is herself an active member of the party.  (Docket No. 156-3 at pp. 52-53.)  When Garcia ran for reelection in 2012, Diaz assisted his campaign by volunteering at polling centers and attending meetings, caravans, walkabouts, and other events.  Id. at p. 53.  Because Diaz and Mayor Surillo live in the same neighborhood, they shared a polling station during elections.  Id. at p. 66.  Mayor Surillo had the occasion to see Diaz working at their local polling station and wearing a blue shirt to signify NPP support.  Id.  After the

election, former mayor Garcia gave Mayor Surillo a tour of the CDT facilities and introduced Diaz as his niece.   Id.

    According to the Municipal defendants, "Diaz assumes that [Mayor] Surillo knows her political affiliation because of her participation in political activities," but Diaz is unable to "assert that [Mayor] Surillo knew her even by name before they saw each other at the CDT after the 2012 elections."  (Docket No. 135 at p. 22.)  Defendants' arguments fall flat.  As an initial matter, the First Circuit Court of Appeals recognizes that political discrimination cases "often turns on an employer's cloaked motives" and "can be hard for a worker to prove," and thus has "consistently held that circumstantial evidence can suffice to show a defendant's knowledge of a plaintiff's political party."  Ocasio-Hernandez v. Fortuño-Burset, 777 F.3d 1, 7 (1st Cir. 2015).   In any event, plaintiffs' evidence indicates not only that Diaz was visibly active in Garcia's campaign, but that she was visibly active in Garcia's campaign in front of Mayor Surillo.   Even if, as defendants argue, Mayor Surillo did not know Diaz's name when he saw her engaged in political activism, a reasonable jury could find the mayor put two and two together when Diaz was introduced to him as Garcia's niece during his post-election tour of the CDT-Yabucoa. This is particularly true here, where plaintiffs proffer "portray[ing] a relatively small community where most everyone knew who everyone else was and political affiliations were common

knowledge." <u>See</u> <u>Torres-Santiago v. Municipality of Adjuntas</u>, 693
F.3d 230, 237 (1st Cir. 2012).  On these facts, taken together, a
reasonable jury could conclude that Mayor Surillo knew that Diaz
was a member of the NPP.

**Plaintiff Medina**

Plaintiffs maintains that Mayor Surillo knows Medina's
political affiliation because Mayor Surillo has known Medina's
family since childhood as members of the NPP and is aware that
Medina's brother served as the NPP-affiliated president of
Yabucoa's municipal assembly for twelve years.  (Docket No. 156-1
at pp. 70-72.)  Indeed, plaintiffs' evidence reveals that during
the December 2012 meeting, Mayor Surillo described Medina as "the
redheaded sister [of the former NPP-affiliated leader]," and
demanded her removal from the CDT-Yabucoa.  <u>Id.</u> at pp. 67-69.  A
reasonable jury could find that Mayor Surillo was aware of Medina's
NPP ties considering their longstanding acquaintanceship and in
light of his targeted and identifying comments, which were
political in nature.  Plaintiffs have thus raised a triable issue
as to whether Mayor Surillo knew of Medina's political affiliation.

**Plaintiff Lazu**

In support of their claim that Mayor Surillo knew Lazu's
political affiliation, plaintiffs put forth evidence that Mayor
Surillo described Lazu during the December 2012 meeting as a
"political agitator" ("tirapiedras").  (Docket No. 156-1 at pp. 67-

69.)  Corroborating Mayor Surillo's identifying comment is Lazu's testimony that he was heavily involved in Garcia's mayoral campaign, often in a manner highly visible to the public, and that he promoted Garcia's candidacy on public radio programs.  See, e.g., Docket No. 156-4 at pp. 122-25, 132-36.  While defendants argue that plaintiffs offer no proof that Mayor Surillo listened to or knew of these radio shows, see Docket No. 135 at p. 32, Velazquez testified that Rivera told her that Mayor Surillo did not want Lazu at the CDT-Yabucoa specifically because of his radio show activism.  (Docket No. 156-2 at p. 80.)  Lazu's public and pervasive involvement in Garcia's campaign in conjunction with Mayor Surillo's alleged comments acknowledging Lazu's activism support a finding that Mayor Surillo knew of Lazu's political affiliation at the time of the events in question.

**Plaintiff Velazquez**

Plaintiffs attempt to show that both Mayor Surillo and Officer Cruz knew of Velazquez's political affiliations, to no avail.  With respect to Mayor Surillo's knowledge, plaintiffs put forth evidence indicating: that Velazquez served as a poll station worker during the 2012 mayoral election, (Docket No. 156-2 at pp. 127-128); that Velazquez held a trust position in Garcia's administration from 2008-2009, (Docket No. 155 at p. 8); and that during her neighbor's PDP meetings, Velazquez barred PDP-affiliated individuals from parking in front of her home and openly displayed NPP and Garcia

propaganda, (Docket No. 155-1 at ¶ 140).  Even when viewed through a filter favorable to plaintiffs, this evidence fails to establish Mayor Surillo's awareness of Velazquez's political affiliation.

To begin, mere fact of Velazquez's political activism, even at the polling stations, is insufficient to establish Mayor Surillo's knowledge.  See Marrero-Saez v. Municipality of Aibonito, 756 F. Supp. 2d 215, 223-24 (D.P.R. 2010) ("Plaintiff cannot prove that defendants had knowledge of her political affiliation merely through testimony of having been seen, or, for that matter, met during routine campaign activity participation.").  Similarly insufficient to establish Mayor Surillo's knowledge is the fact that Velazquez served as a municipal employee under a previous administration, particularly here, where Velazquez's political trust stint took place several years ago.  Finally, the evidence concerning Velazquez's outward displays of NPP loyalty during her neighbor's PDP meetings adds little to the knowledge inquiry, as the record contains no indication that Mayor Surillo (or Officer Cruz, for that matter) attended these meetings.  Plaintiffs' evidence, as a whole, falls short of enabling a reasonable jury to find that Mayor Surillo knew of Velazquez's political affiliation. See id. at 223 ("[T]he fact that a plaintiff is a well-known supporter of that party, has political propaganda on his house or car, held trust positions when that party was in power, or suffered an adverse employment action shortly after a change in

administration, are insufficient to show that defendants must have been aware of his political affiliation.").

Plaintiffs' evidence with respect to Officer Cruz fares no better. In support of their assertion that Officer Cruz knew that Velazquez was an NPP member, plaintiffs offer only Velazquez's testimony that she and Officer Cruz both participated in walkabouts for their respective parties, which "would frequently cross paths." (Docket No. 155 at p. 8.) Without more, "[p]laintiffs' proposition is speculative, and insufficient to satisfy the *prima facie* case standard," at the summary judgment stage. See Febus-Rodriguez v. Questell-Alvarado, 660 F. Supp. 2d 157, 172 (D.P.R. 2009) (finding deposition testimony stating that defendant may recognize some of plaintiffs' faces "does not equate knowledge of their political affiliations").

Plaintiffs are required to proffer evidence enabling a reasonable jury to find that Mayor Surillo and Officer Cruz knew of Velazquez's political affiliation. They have not. If the Municipal defendants did not know Velazquez's political affiliation, Velazquez's political affiliation could not have been a substantial motivating factor for the adverse employment actions taken against her. See Febus-Rodriquez, 660 F. Supp. 2d at 173.

For the foregoing reasons, the Municipal defendants' motion for summary judgment, (Docket No. 135), is **GRANTED** as to plaintiff

Velazquez's claims.   Velazquez's claims against the Municipal defendants are therefore **DISMISSED**.

### Adverse Employment Actions

Both sets of defendants forgo challenging plaintiffs' proof as to the adverse-action element.  As such, the third element is no obstacle to plaintiffs.

### Political Affiliation as a Substantial or Motivating Factor for the Adverse Employment Actions

The fourth element requires plaintiffs to establish that their political affiliation was a substantial or motivating factor for the adverse-employment actions.   See Pequero-Moronta, 464 F.3d at 48-50.  To meet this burden, "plaintiffs often present evidence of verbal or written statements of political or personal animus." Id. at 45-46; see, e.g., Rodriguez-Marin v. Rivera-Gonzalez, 438 F.3d 72, 81 (1st Cir. 2006) (finding sufficient evidence of political discrimination where witness testified that defendants "made statements to her indicating that her demotion was politically motivated").  Also probative of discriminatory animus is a politically-charged employment atmosphere, "occasioned by [a] major political shift" and "coupled with the fact that plaintiffs and defendants are of competing political persuasions." Torres-Santiago, 693 F.3d at 240 (internal quotation marks omitted).  As discussed above, the record portrays a politically-charged environment at the CDT-Yabucoa in the wake of the 2012 mayoral election.  The record also contains evidence that, amid

this backdrop, defendants made several politically-divisive comments, such as Simmons and Rivera's incessant warnings to plaintiffs that their jobs were on the line because of the regime change and Mayor Surillo's vocalized desire to remove plaintiffs because of their support of former mayor Garcia.  Defendants made most of these statements shortly before NPP-member employees were fired, demoted, and transferred.

In a political discrimination case, a plaintiff who has lost her job might also "present evidence about the hiring practices of the defendant in the wake of an election," such as "evidence that the defendant[] filled all, or most, recently vacated positions with supporters of [his] political affiliation," or "evidence that the plaintiff's immediate successor had the same affiliation as the defendant."  Peguero-Moronta, 464 F.3d at 46.  Here, plaintiffs present evidence that Diaz was immediately replaced by Riefkohl, one of Mayor Surillo's polling officers.  See, e.g., Docket No. 156-3 at pp. 83-85, 93-94; Docket No. 156-2 at pp. 67-73.  In response, the Municipal defendants maintain that Riefkohl did not replace Diaz because she was hired to fulfill HR duties and Diaz lacked the credentials to fulfill this role.  (Docket No. 135 at pp. 22-25.)  Even so, plaintiffs also present evidence showing that just two weeks after Diaz was terminated, SM Medical hired a member of Mayor Surillo's campaign team, Rodriguez, to serve as the municipal liaison's secretary.  (Docket No. 156-2 at pp. 66-67, 77-

79.)  Rivera admitted that he knew no reason why Diaz could not perform these duties.  <u>See</u> Docket No. 156-6 at p. 63.

Plaintiffs also present evidence that Medina was replaced by Ortiz - the daughter of Mayor Surillo's campaign backers - who was hired as a nursing supervisor around the same time that Medina was stripped of her director of nursing duties.  Ortiz had only recently finished school, lacked supervisory experience, and was not yet licensed, <u>see, e.g.</u>, Docket No. 133 at ¶¶ 390, 393, 395-396, and defendants admit that they hired her although she did "not meet all [of] the requirements," <u>id.</u> at ¶ 412.  This evidence supports an inference that Medina's demotion was politically motivated.  <u>See</u> <u>Hiraldo Cancel v. State Ins. Fund Corp.</u>, 326 F. Supp. 2d 286, 294-95 (D.P.R. 2004) (finding NPP plaintiff "clearly met her *prima facie* burden" where record contained "undisputed proof that plaintiff - who was adequately performing her duties as supervisor - was substituted by a PPD sympathizer with remarkably less experience and credentials").[15]

Indeed, the fact that all of the terminated and demoted employees - Diaz, Medina, and Lazu - were NPP members, while all of the new hires - Riefkohl, Rodriguez, and Ortiz - were PDP members, is itself indicative of politically-discriminatory causality.  <u>See,</u> <u>e.g.</u>, <u>Acosta-Orozco v. Rodriguez-de Rivera</u>, 132 F.3d 97, 101 (1st

---

[15]  The parties quibble over whether Ortiz replaced Medina or fulfilled a new role altogether.  The mere fact that Ortiz was titled "nurse supervisor" instead of "nurse director" is not dispositive.  This is an issue for a jury to decide, as the record evidence cuts both ways.

Cir. 1997) (reversing grant of summary judgment where record showed
that "plaintiffs were all members of the adverse party, that their
superiors knew this, and that their duties were given to active
supporters of the party in power").  To that end, equally telling
is the fact that defendants provide no evidence that any PDP member
was adversely affected.  See Rodriguez-Rios v. Cordero, 138 F.3d
22, 24 (1st Cir. 1998) (finding supportive of plaintiff's *prima
facie* political discrimination case evidence that "the putative
reorganization witnessed seven PDP-member demotions, with no
evidence that any NPP member was either demoted or discharged");
see also Rodriguez-Pinto v. Tirado-Delgado, 982 F.2d 34, 40 (1st
Cir. 1993) (stressing that every single one of the employees
demoted under the "reorganization" schemes was a supporter of the
political party that opposed the party in power).

     Finally, "[t]he temporal proximity between a change in
political administrations and an adverse employment action is
relevant to the issue of whether political affiliation was a
substantial or motivating factor in the adverse employment
decision." Pequero-Moronta, 464 F.3d at 53.  Here, Mayor Surillo
was elected in November 2012, met with Simmons and Rivera in
December 2012, and assumed office in January 2013.  By the end of
January 2013, Diaz was fired; a few weeks later, Medina was demoted
and Lazu was demoted and transferred.  This temporal proximity
further supports a finding that plaintiffs' NPP ties and support

for Garcia was a substantial or motivating factor.  See id. at 53 (finding relevant to the issue of discriminatory causation three dismissals within one month of a change in political administrations).

When viewed as a whole and in a light most hospitable to plaintiffs, the above evidence creates a triable issue as to whether political affiliation was a substantial or motivating factor in the adverse employment actions taken against plaintiffs Diaz, Medina, and Lazu.

## **Mt. Healthy Defense**

"[E]ven if a jury could reasonably conclude from the summary-judgment evidence that [a plaintiff's] political affiliation was a substantial or motivating factor in [defendants'] decisional calculus, [s]he still would not be home free."  See Soto-Padro, 675 F.3d at 5.  Once a plaintiff satisfies her prima facie burden, "the devoir of persuasion shifts to the defendants to prove that they would have taken the same action regardless of the plaintiff's political affiliation."  Gomez v. Rivera Rodriguez, 344 F.3d 103, 110 (1st Cir. 2003).[16]

---

[16] The Supreme Court has described the Mt. Healthy defense as dealing with mixed-motive driven employment actions—where there are both "lawful" and "unlawful" reasons for the adverse employment action.  See Soto-Padro, 675 F.3d at 6 (citing McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 359 (1995)).  "'[I]f the lawful reason alone would have sufficed to justify the [action],' then the employee cannot prevail." Id. (quoting McKennon, 513 U.S. at 359).

A defendant seeking the protection of the Mt. Healthy defense bears the burden of persuasion: she must convince the factfinder that her nondiscriminatory reason is credible. Padilla-Garcia, 212 F.3d at 77-78.  In this regard, the burden-shifting mechanism for political discrimination claims differs significantly from the device used in other employment discrimination contexts, such as Title VII cases.  As the First Circuit Court of Appeals explained:

> Under Title VII, once the plaintiff establishes a *prima facie* case of discrimination, only a limited burden of production passes to the employer to articulate a legitimate, nondiscriminatory reason for its actions. The employer under Title VII need not submit sufficient evidence to persuade the factfinder because the plaintiff retains the burden of persuasion at all times.  In contrast, under the Mt. Healthy analysis for political discrimination, the burden of persuasion passes to the defendant-employer once the plaintiff produces sufficient evidence of her *prima facie* case.  In other words, the plaintiff-employee will prevail unless the factfinder concludes that the defendant has produced enough evidence to establish that the plaintiff's dismissal would have occurred in any event for nondiscriminatory reasons.

Padilla-Garcia, 212 F.3d at 78 n.8 (internal citations and quotation marks omitted).

If the defendant persuades, the plaintiff may discredit the proffered nondiscriminatory reason, "either circumstantially or directly, by adducing evidence that discrimination was more likely than not a motivating factor."  Id. at 77.  "The evidence by which the plaintiff established her *prima facie* case may suffice for a factfinder to infer that the defendant's reason is pretextual and to effectively check summary judgment."  Id. at 78.

For their Mt. Healthy defense, defendants advance departmental restructuring as a nondiscriminatory reason for the challenged employment actions. See, e.g., Docket No. 131 at pp. 24-25. Specifically, the SM Medical defendants contend that the challenged decisions were done "taking into consideration the corporate reorganization and financial conditions of SM Medical." Id. at p. 24.[17]  Defendants bear the burden of persuading the factfinder that their reasons - cost concerns and restructuring -are credible. See Padilla-Garcia, 212 F.3d at 77-78. To support their claim that the post-election restructuring was necessary for fiscal reasons, the SM Medical defendants paint a picture of financial uncertainty following the 2012 mayoral election. According to the SM Medical defendants, leading up to the election, the Municipality had become delinquent on its monthly payments, and after the election, they feared they might lose the CDT-Yabucoa contract altogether. (Docket No. 133 at ¶ 33.)  The SM Medical defendants insist that "some action[] had to be taken." Id. at ¶ 34. To cope with the alleged financial crisis, "SM Medical began a process of reorganization [in] December 2012." Id. at ¶ 32.

To initiate the restructuring process, SM Medical created an HR Department at the CDT-Yabucoa, (Docket No. 131 at p. 24), and hired Delgado as its director on February 1, 2013, (Docket No. 133

---

[17]  The Municipal defendants echo this position. See, e.g., Docket No. 135 at p. 24 (maintaining that SM Medical was "going through [a] serious financial situation" and that "some positions needed to be restructured").

at ¶ 288).  Simmons specifically tasked Delgado with creating a restructuring proposal, keeping in mind the goal of "maximiz[ing] the resources and minimiz[ing] the costs."  (Docket No. 131 at p. 24.)  To execute this task, Delgado allegedly "analyzed the established organizational chart of each CDT," reviewed each employee's job description, "salar[y], attendance patterns, [and] performance," and considered "the recommendations and input of the supervisors."  Id.  Since the other SM Medical centers were profitable, Simmons indicated that the major concern was the CDT-Yabucoa.  See Docket No. 133 at ¶ 24; Docket No. 131 at p. 24.

In response, plaintiffs argue that defendants' justification is post hoc and pretextual.  (Docket No. 155 at pp. 44-46.) Plaintiffs give several reasons to doubt defendants' reorganization defense.  To begin, as evidence undermining SM Medical's claims of financial hardship, plaintiffs point to Simmons's testimony that Mayor Surillo's administration made a commitment to keep the contract with SM Medical as early as January 2013 and that the Municipality resumed its payments in February 2013.  (Docket No. 155-1 at ¶ 290.)  As reason to question the genuineness of the purported reorganization, plaintiffs point out that defendants do not produce HR Director Delgado's actual restructuring proposal, see Docket No. 155 at p. 46, despite the fact that Delgado testified that she prepared a "proposal" containing her recommendations, see, e.g., Docket No. 156-9 at pp. 14-15.

The Court notes from the outset that defendants' reorganization defense does not apply neatly to Diaz, who was fired before the restructuring process formally commenced.[18]  Defendants insinuate that Diaz's termination was necessary to make room for Delgado, who was tasked with initiating the review process.  See Docket No. 131 at p. 25; Docket No. 135 at p. 23-24.[19]  Yet, defendants they make no effort to substantiate this contention or explain why Diaz's position was the one chosen for elimination.[20]  Given the lack of evidence attesting to the asserted nondiscriminatory reason for firing Diaz, a rational factfinder reasonably could infer that defendants' true purpose was political discrimination.  Cf. Rodriguez-Rios, 138 F.3d at 26 (rejecting reorganization defense where defendants hastily executed the purported plan without governing board's approval, deviating from normal practice).

---

[18] Defendants admit that Delgado, the conductor of the restructuring review process, started as the HR director on February 1, 2013.  See Docket No. 135 at pp. 23-25; Docket No. 131 at pp. 24-25.  By that time, Diaz had already been fired.  Delgado testified that she had nothing to do with the decision to terminate Diaz.  (Docket No. 156-9 at pp. 107-108.)

[19] Defendants maintain that Diaz's termination was necessary because SM Medical was in need of HR personnel and that in order to accommodate this need at the CDT-Yabucoa, "SM Medical had to eliminate a secretary position."  Docket No. 135 at p. 23; see also Docket No. 131 at p. 18.

[20] Although the Municipal defendants passingly claim that Simmons learned, at some point, that complaints had been filed about Diaz, (Docket No. 135 at p. 23), they do not specify when this discovery was made nor do they indicate that this fact went into their decisional calculus.

Even assuming Diaz's termination was part of, or a prerequisite to, implementing a restructuring plan, defendants' motives remain questionable.  While defendants claim that the restructuring was a cost-cutting measure, the record indicates that SM Medical hired several new employees simultaneous to the alleged downsizing, many of whom happened to be Mayor Surillo's political supporters.  See Rodriguez-Rios, 138 F.3d at 26 (discerning no record basis for concluding that putative reorganization was motivated by cost savings where "defendants point to no record support for an inference that [plaintiff's] demotion materially reduced the cost of operating the [HR] Directorate," "particularly in light of the uncontested evidence that twenty new recruits were hired by the [HR] Department during the reorganization, none of whom were shown to have been PDP members").

For instance, soon after Diaz was fired, SM Medical hired two employees, Riefkohl and Rodriguez, to fulfill administrative support functions.  Incidentally, both of these employees assisted with Mayor Surillo's campaign and both were sent to the CDT-Yabucoa for jobs by Mayor Surillo after his electoral victory.  While defendants attempt to resolve this paradox by explaining that Riefkohl provided greater bang (an HR degree) for their buck (lower salary), see Docket No. 131 at p. 18, they never reconcile the decision to hire Rodriguez to be the administrative assistant to the municipal liaison.  Despite defendants' tacit concession that

Rodriguez's duties were within Diaz's wheelhouse, see, e.g., Docket
No. 156-6 at p. 63, the record reveals that Diaz was not afforded
the opportunity to apply for the position, even for less money.

The record also reveals that amid the alleged downsizing, SM
Medical hired Ortiz, whose parents contributed to Mayor Surillo's
campaign.  Although she was given the title "nursing supervisor,"
Ortiz effectively took on Medina's supervisory duties.  See Docket
No. 156-1 at pp. 30-34.  Approximately one week after hiring Ortiz,
SM Medical removed Medina as director of nursing as part of its
"restructuring."  Incidentally, Ortiz, like Riefkohl and Rodriguez,
was sent to the CDT-Yabucoa by Mayor Surillo, and she allegedly
told Medina that she had been placed in the position by Mayor
Surillo.  Docket No. 156-1 at p. 97.

The evidence that SM Medical was considering and hiring new
employees for the CDT-Yabucoa while the facility's HR director was
supposedly working to reduce the size of the staff undercuts
defendants' claim that a cost-saving restructuring was the reason
for the adverse actions at issue.  See Nereida-Gonzalez, 990 F.2d
at 706 (noting that evidence suggesting that defendants'
reorganization was a "sham" may be considered probative of
discriminatory animus).  Casting further doubt on their
reorganization defense is evidence that Simmons and Rivera
consistently attributed the adverse actions at issue to plaintiffs'
political affiliation, without so much as mentioning a

restructuring plan.  See, e.g., Docket No. 156-3 at p. 118; Docket
No. 156-2 at pp. 127-28.

On a final note, defendants' kitchen-sink attempts to justify
Lazu's demotion and transfer does not salvage their Mt. Healthy
defense.  In their motions for summary judgment, defendants detail
multiple incidents of harassment and other misconduct as well as a
pattern of absenteeism.[21]  After listing Lazu's litany of lapses,
defendants take pains to attribute Lazu's transfer and demotion to
the CDT-Yabucoa's financial situation.  See Docket No. 131 at
p. 22; Docket No. 135 at p. 35.  Neither set of defendants submit
that Lazu's missteps, standing alone, warranted his demotion and

---

[21] Although defendants provide no documentary evidence of Lazu's
attendance patterns, the record is largely undisputed as to three
particular instances of misconduct. First, at some point around before
June or August 2012, "Lazu took prescription medication (Toradol) without
a doctor's order or consent and administered it to a co-worker." (Docket
No. 131 at p. 21.) Second, defendants describe an incident in which Lazu
engaged in "inappropriate behavior with a female doctor who felt sexually
harassed," and then later "sent threatening text messages" to a male
emergency room doctor who had intervened on the female doctor's behalf.
See Docket No. 131 at p. 21; see also Docket No. 133 at ¶¶ 212-219. As
a result, Lazu was suspended for fifteen days. Id. at ¶ 213.  According
to Lazu's testimony, these events occurred in approximately August 2012.
See Docket No. 156-4 at pp. 42-44. Third, at some point during his
employment, Lazu knowingly submitted to SM Medical a falsified
certificate of good standing in order to hide a past criminal conviction
of second-degree murder from his employer.  Simmons testified that
without a certificate of good conduct, Lazu "could not have his nursing
license and therefore he could not have his papers up to date." (Docket
No. 156 at pp. 42-43.)  At the time, Simmons suspended Lazu so that he
could get his papers in order.  Id.

transfer.[22]   As such, the CDT-Yabucoa's purportedly bad financial situation is still the hook upon which defendants' Mt. Healthy defense hat hangs.   In this regard, the blemishes on Lazu's employment record serve defendants only insofar as they lend evidentiary support to their claim that the decision to transfer and demote Lazu was made pursuant to a *bona fide* restructuring plan.   But as discussed above, plaintiffs have raised material issues of fact as to the validity of defendants' reorganization defense.

In sum, although defendants advance a seemingly legitimate nondiscriminatory reason for their actions, plaintiffs' evidence suffices to enable a reasonable factfinder to infer that defendants' reason is pretextual.

The SM Medical defendants' motion for summary judgment, (Docket No. 131), is **DENIED** as to the remaining plaintiffs. Plaintiffs Diaz, Medina, and Lazu's claims against the SM Medical defendants survive.   Further, the Municipal defendants' motion for summary judgment, (Docket No. 135), is **DENIED** as to the remaining plaintiffs.   Plaintiffs Diaz, Medina, and Lazu's claims against defendants Mayor Surillo and the Municipality survive.

---

[22]  The SM Medical defendants admit that when HR Director Delgado brought these events to Simmons's attention during her review, Simmons responded that "action [had been] taken already."   (Docket No. 133 at ¶ 341.) Similarly, the Municipal defendants concede that at the time of Lazu's transfer, "it would [have been] inappropriate" to fire him because of the temporal delay.   (Docket No. 135 at p. 35.)

### QUALIFIED IMMUNITY

The Municipal defendants make a half-hearted attempt to raise the defense of qualified immunity, arguing that at all relevant times, "any actions [sic] taken by [defendants] were in accordance with the law, rules and regulations in effect at that time, in good faith, and within the scope of their duties." See Docket No. 135 at p. 68.

Qualified immunity provides "a safe harbor for public officials acting under the color of state law who would otherwise be liable under [section 1983] for infringing the constitutional rights of private parties." Whitfield v. Melendez-Rivera, 431 F.3d 1, 6 (1st Cir. 2005).  The doctrine "protects government officers and employees from suit on federal claims for damages where, in the circumstances, a reasonable official could have believed his conduct was lawful." Olmeda v. Ortiz-Quinonez, 434 F.3d 62, 65 (1st Cir. 2006).

The qualified immunity inquiry is a two-part test. Maldonado v. Fontanes, 568 F.3d 263, 268-69 (1st Cir. 2009).  First, the Court asks "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right." Id. at 269. Here, the Court has already found that plaintiffs Diaz, Medina, and Lazu sufficiently established that Mayor Surillo violated their First Amendment rights.

Second, the Court asks "whether the right was 'clearly established' at the time of the defendant's alleged violation." Id. The second part of the qualified immunity analysis is divided into two sub-inquiries: "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable official would have understood that what he was doing violated that right, and (b) whether the particular factual violation in question would have been clear to a reasonable official." Diaz-Bigio v. Santini, 652 F.3d 45, 50 (1st Cir. 2011).

In this case, the availability of the qualified immunitydefense thus turns on whether, at the time Mayor Surillo politically discriminated against plaintiffs, their constitutional right to associate was "clearly established." With respect to the first sub-part, defendants are silent as to whether the law surrounding the First Amendment rights of non-policymaking employees lacked clarity at the time of the alleged constitutional violation. A swift review of the relevant case law in this district reveals no lack of clarity. See, e.g., Vazquez-Pagan v. Borges-Rodriguez, Civ. No. 12-1972 (MEL), 2014 WL 5148457, at *7 (D.P.R. Oct. 14, 2014) ("[Plaintiff] has alleged facts that, if found by a jury to be true, would establish that defendants violated her First Amendment right to freedom of association and *the First Amendment right not to be discriminated against is clearly established*." (emphasis added)); Davila-Torres v.

Feliciano-Torres, 924 F. Supp. 2d 359, 370 (D.P.R. 2013) ("[F]or nearly a quarter of a century, First Circuit precedent has clearly established that reduction in responsibility, when alleged under the auspices of political discrimination, violates the First Amendment.").

With respect to the second sub-part, the court "should [ ] address the particular conduct in question, to decide whether an objectively reasonable official would have believed that his conduct was lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct." Kelley v. LaForce, 288 F.3d 1, 6 (1st Cir. 2002) (internal citations and quotation marks omitted). The objective reasonableness inquiry is "highly fact specific," Swain v. Spinney, 117 F.3d 1, 9–10 (1st Cir. 1997); accord Maldonado, 568 F.3d at 269, and often requires "[an] examination of the information possessed by the defendant officials," Kelley, 288 F.3d at 7. The Municipal defendants, however, fail to delineate the facts known to Mayor Surillo at the time of the events in question. Because the Municipal defendants do not elaborate upon the reasonableness of Mayor Surillo's actions, and because the record as a whole is riddled with material factual disputes, the Court is unable to render a determination as to qualified immunity as this juncture.

For the foregoing reasons, the Municipal defendants' request to invoke the qualified immunity defense, (Docket No. 135 at pp. 66-69), is **DENIED WITHOUT PREJUDICE.**

**STATE LAW CLAIMS**

Plaintiffs allege claims pursuant to the Puerto Rico Constitution as well as various local laws, including Puerto Rico's anti-discrimination statute, Law No. 100 of June 30, 1959 ("Law No. 100"), P.R. Laws Ann. tit. 29, § 146, *et seq.*; Puerto Rico's wrongful termination statute, Law No. 80 of May 30, 1976 ("Law No. 80"), P.R. Laws Ann. tit. 29, § 185, *et seq.*; and Puerto Rico's general tort statute, Article 1802 of the Puerto Rico Civil Code ("Article 1802"), P.R. Laws Ann. tit. 31, § 5141. (Docket No. 44 at p. 55.) The SM Medical defendants contend that "[insofar as] plaintiffs have failed to assert a valid claim of political discrimination, all of plaintiffs' federal causes of action . . . should be dismissed," and thus this Court should decline to exercise supplemental jurisdiction over the remaining state law claims. (Docket No. 131 at p. 25.)

Federal courts have jurisdiction over state claims when they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). A district court may decline to exercise supplemental jurisdiction over a claim if it "has dismissed all claims over which it has original jurisdiction." Id. § 1367(c)(3).

Here, the SM Medical defendants' plea for the dismissal of the state-law claims assumes the dismissal of all of plaintiffs' federal-law claims.  Most of the federal-law claims against the SM Medical defendants, however, survive summary judgment.  The Court thus elects to retain supplemental jurisdiction.

The SM Medical defendants' request for dismissal of plaintiffs' state law claims, (Docket No. 131 at p. 25), is **DENIED**.

**CONCLUSION**

For the reasons articulated above, the SM Medical defendants' motion for summary judgment, (Docket No. 131), is **GRANTED in part and DENIED in part**.  The SM Medical defendants' motion is **GRANTED** in so far as it pertains to plaintiff Velazquez's claims, but **DENIED** as to the remaining plaintiffs' claims.

The Municipal defendants' motion for summary judgment, (Docket No. 135), is **GRANTED in part and DENIED in part**.  The Municipal defendants' motion is **GRANTED** in so far as it pertains to plaintiff Velazquez's claims, and **GRANTED** as to all claims against defendant Officer Cruz, but **DENIED** as to the remaining claims.

Thus, all of plaintiff Velazquez's claims and all claims against defendant Officer Cruz are **DISMISSED WITH PREJUDICE**.

The Municipal defendants' request to invoke the qualified immunity defense, (Docket No. 135 at pp. 66-69), is **DENIED WITHOUT PREJUDICE**.

Civil No. 13-1473 (FAB)                                                        67

Finally, the SM Medical defendants' request for dismissal of plaintiffs' state claim claims, (Docket No. 131 at p. 25), is **DENIED**.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, June 23, 2015.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE